AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of New Mexico

<table>
<tr><td>In the Matter of the Search of<br><i>(Briefly describe the property to be searched<br>or identify the person by name and address)</i><br><br>541 Palomas Drive SE Apt. A<br>Albuquerque, NM. 87108</td><td>)<br>)<br>)<br>)<br>)<br>)</td><td>Case No.   22-MR-1646</td></tr>
</table>

**FILED**
United States District Court
Albuquerque, New Mexico

Mitchell R. Elfers
Clerk of Court

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

located in the _____ District of _____ New Mexico _____ , there is now concealed *(identify the person or describe the property to be seized)*:

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 8 U.S.C. § 1324 | Bringing in and harboring certain aliens |
| 18 U.S.C. § 1203 | Hostage Taking |
| 18 U.S.C § 922(g)(5)(A) | Unlawful Acts, Alien in Possession of a Firearm |

The application is based on these facts:

See attached affidavit, submitted by SA Michael McCluskey and approved by AUSA Letitia Simms

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Michael McCluskey, HSI Special Agent
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone _____ *(specify reliable electronic means)*.

Date:  November 4, 2022

_____
*Judge's signature*

City and state:  Albuquerque, NM

Jerry H. Ritter, U.S. Magistrate Judge
_____
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

IN THE MATTER OF THE SEARCH OF
THE PREMISES LOCATED AT 541
PALOMAS DRIVE SE, APT. A,
ALBUQUERQUE, NEW MEXICO, 87108

Case No. _____
22-MR-1646

**Filed Under Seal**

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Michael J. McCluskey, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I, your affiant, make this affidavit in support of an application for a search warrant under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises known as 237 90th Street SW, Albuquerque, New Mexico, hereinafter "TARGET PREMISES" further described and depicted in Attachment A, for the things described in Attachment B.

2.      I am a Special Agent (SA) with the Department of Homeland Security, Homeland Security Investigations (HSI), and have been employed by HSI since May of 2018. I am an investigative law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), and I am empowered by law to conduct criminal investigations and make arrests for felony offenses. I am graduate of the Federal Law Enforcement Training Center (FLETC) and a graduate of Homeland Security Investigations Special Agent Training (HSISAT) in Brunswick, Georgia. Prior to becoming a Special Agent, I worked for the Santa Fe Police Department (SFPD) for over ten years as a Patrol Officer and a Detective Grade II. While employed with the SFPD, I participated in numerous large-scale criminal investigations, drug investigations, drug seizures, crimes against persons, and the procurement and processing of digital evidence to include evidence collected from cellular devices, computers, and hard drives. As a

Special Agent with Homeland Security Investigations (HSI), I have participated in a wide range of federal criminal investigations, to include drug trafficking and human smuggling, and obtained numerous residential search warrants related to those crimes.

3.      Throughout my law enforcement career, I have received training and gained experience pertaining to federal criminal procedures, federal criminal statutes, United States Immigration and Nationality law, United States Customs laws and regulations, and other federal and state laws including but not limited to: Alien/human smuggling, human trafficking, the importation and distribution of controlled substances, bulk cash smuggling, firearms offenses, wire fraud, and conspiracy.  I am authorized and presently assigned to investigate controlled substance violations, including violations of 21 U.S.C. § 841(a)(1), and federal immigration law, including violations of 8 U.S.C. § 1324. Additionally, I have received advanced training in dismantling and disrupting Drug Trafficking Organizations (DTOs), money laundering investigations, attended the High Intensity Drug Trafficking Area (HIDTA) Supervisor's course, and served approximately eighteen (18) months as a Task Force Officer (TFO) with the Drug Enforcement Administration (DEA).

4.      In addition to my training and experience, I have developed information I believe to be reliable from additional sources including, but not limited to:

        a.   Information provided by Special Agents ("SA"), Intelligence Research Specialists (IRS) of the Department of Homeland Security, and other law enforcement officials ("Agents"), including oral and written reports that I have received directly or indirectly from said investigators;

        b.   Sources of Information (SOIs)

2

    c.   Results of physical surveillance conducted by agents during this investigation;

    d.   A review of telephone toll records and subscriber information;

    e.   Information derived from consensually recorded conversations;

    f.   A review of driver's license and automobile registration records;

    g.   Records from commercial databases; and

    h.   Records from the National Crime Information Center ("NCIC").

5.    Because this Affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only those facts that I believe are relevant to the determination of probable cause to support the issuance of the requested warrant.  When the statements of others are set forth in this Affidavit, they are set forth in substance and in part.

6.    Based on the facts set forth in this Affidavit, there is probable cause to believe that violations of 8 U.S.C. § 1324 and 21 U.S.C. § 841, have been committed, are being committed, and will continue to be committed using the TARGET PREMISES.

7.    The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711.  Specifically, the Court is a district court of the United States that has jurisdiction over the offenses being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

(Continued on following page)

## RELEVANT CRIMINAL STATUTES

8.    I believe there is probable cause that the SUBJECTS have committed, are

committing, and will continue to commit offenses involving violations of:

>    8 U.S.C. § 1324 – Bringing in and harboring certain aliens

>    18 U.S.C § 1203 – Hostage Taking

>    18 U.S.C § 922(g)(5)(A) – Unlawful Acts, Alien in Possession of a Firearm

## EVIDENCE SOUGHT DURING SEARCH

9.    Based on my training, experience, and participation in this and in similar

investigations, I believe that individuals involved in human smuggling of undocumented citizens

often conceal evidence of their activities in their residences and businesses, or the residences of

friends or relatives, and in surrounding areas to which they have ready access such as garages,

carports and outbuildings. They also conceal evidence in vehicles, including vehicles outside of

their residences and businesses, so that they have ready access to it and so that they can hide it

from law enforcement, including law enforcement officers executing search warrants at their

residences or businesses. Evidence also may be found in other areas to which a human smuggler

has ready access, such as rented storage areas and safety deposit boxes, or buried underground

on their property.  This evidence, which is discussed in detail in the following paragraphs,

includes undocumented persons hiding in storage sheds or outbuildings, items typically found in

possession of undocumented persons such as fraudulent forms of identification, foreign currency,

fraudulent immigration documents, records, human smuggling stash house secondary locations,

proceeds from human smuggling, and valuables obtained from proceeds.

10.    Human smugglers often travel domestically and internationally to facilitate their

human smuggling efforts.  Evidence of foreign and domestic travel by persons engaged in illegal

human smuggling includes travel itineraries, airline tickets, receipts, passports, and visas.  These items are stored by human smugglers on their person or in their business, residences and surrounding garages, outbuildings, carports and yards, the residences of relatives and in cars. Many of these items are accessible via the internet and can be downloaded and saved on a computer or digital media and on storage media.  The term "digital media" includes personal digital assistants (PDAs), smartphones, tablets, BlackBerry devices, iPhones, iPods, iPads, digital cameras, and cellular telephones.  The term "storage media" includes any physical object upon which electronic data can be recorded, such as hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media or digital medium.

11.     Human smugglers often use storage facilities for items related to human smuggling and human trafficking that are at a location away from their residences and businesses. These off-site storage facilities are often commercial storage lockers and rooms. These locations are often used to store or hide people, the personal belongings of illegally smuggled undocumented non-citizens, money, fraudulent documents, and valuables obtained through their illegal proceeds. Human smugglers often keep documents and other items tending to show the existence of other fraudulent documents, materials used to produce fraudulent documents, and valuables obtained through illegal proceeds in areas such as storage facilities. Those documents and other items include rental agreements, receipts, keys, notes, and maps specifically concerning off-site storage rooms, routes to additional "human stash houses" or "safe houses", lockers, and safety deposit boxes.  This evidence may be found on their person or in their businesses, residences and surrounding garages, outbuildings, carports and yards, the residences of friends or relatives, and cars.  This type of documentation can be stored on digital media and concealed virtually anywhere.

12.     Evidence of significant, unexplained income of human smugglers, or for the acquisition and concealment of money and assets of human smuggling efforts, can be found on banking and investment account statements, credit card account statements, canceled checks, money orders, deposit slips, check and savings books, business and personal ledgers, accounting records, safe deposit box records and keys, federal and state tax records, rental receipts, rental agreements, utility bills, overnight mail receipts, telephone bills, loan statements records reflecting ownership of real or personal property (such as deeds of trust or vehicle registration, insurance, and ownership information), vehicle and property rental records, lease and purchase agreements, and canceled mail.  These records can be maintained on paper, but also can be maintained as electronic data on computers and other digital media.  The above items are typically kept by human smugglers on their person or in their businesses, residences and surrounding garages, outbuildings, carports, and yards, the residences of friends or relatives, and vehicles.

13.     The use of digital media, including smartphones, tablets, cellular phones, and digital devices, has become part of everyday life. This is also true for human smuggling organizations. Information stored in electronic form on all of the above devices can provide evidence of human smuggling and/or drug trafficking. Human smugglers frequently use some or all of these devices to communicate with co-conspirators, and others involved in the human smuggling trade. These communications include, but are not limited to, phone calls, text messages, SMS (Short Message Service) messaging, MMS (Multimedia Messaging Service) messaging, social media posts and messaging, and smartphone application messaging services. Smartphones, tablets, cellular phones, and digital devices are frequently capable of storing messages, emails, social media communications, and communications made over smartphone

applications. The content of these communications will often provide evidence of human smuggling. Numbers stored on a telephone (such as Caller ID lists reflecting recently received calls, speed dial lists of names and/or telephone numbers, and logs of outgoing and incoming calls) can provide evidence of who the human smuggler is calling, and thus the identity of potential associates.

14.     Human smuggling organizations often maintain firearms and ammunition on their person or in their homes, businesses or cars to protect themselves, the undocumented persons they are smuggling into or across the United States, their associates, and their profits.  They also may maintain indicia of firearms such as receipts for firearms and ammunition, boxes for firearms and ammunition, firearms cleaning supplies, and instruction manuals and other documentation for firearms and ammunition. I know that weapons (including rifles, shotguns, and handguns) are tools of the trade for human smugglers, who often keep firearms in close proximity to themselves and their contraband to protect them from other smugglers and law enforcement.

15.     Documents showing who owns, occupies, or controls the location being searched also show who is responsible for the items found on the premises, including contraband, undocumented persons, and other evidence seized.  Documents and items showing the identity of the persons owning, residing in, or controlling the area being searched include, but are not limited to, utility and telephone bills, canceled envelopes and correspondence, outgoing answering machine messages, tax returns, keys, deeds and mortgage receipts.  These documents may also be produced on computers, downloaded from online accounts or scanned into digital format and stored on computers and related digital media.

16.     Based on my training and experience, particularly my experience relating to the investigation of properties such as the one listed in Attachment A, I know that it is common for human smugglers in such areas to keep evidence of their crimes throughout their properties. I further know that all of the evidence described above could be located not only in the main residence, adjoining or adjacent building sharing the same property, but also in garages, outbuildings, storage containers, safes, safety deposit boxes, sheds, barns, vehicles, and even buried in the ground.

### COMPUTERS, ELECTRONIC STORAGE AND FORENSIC ANALYSIS

17.     As described above and in Attachment B, this application seeks permission to search for evidence and records that might be found on the property of the TARGET PREMISES in whatever form they are found.  Much of the evidence and records described in the paragraphs above, and in Attachment B, can also be produced and/or stored on computers, digital media and other storage media, such as computer hard drives, external hard drives, thumb drives, secure digital cards and other types of flash memory cards, compact disks and floppy disks, personal digital assistants (PDAs), smartphones, tablets, BlackBerry devices, iPhones, iPods, iPads, digital cameras, and cellular telephones.  For this reason, I submit that if a computer aided digital medium or storage medium is found on the property of the TARGET PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B). Because several people appear to share the TARGET PREMISES, it is possible that the TARGET PREMISES will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime.  If it is nonetheless determined that it is possible the things described in

this warrant could be found on any of those computers or storage media, the warrant applied for

would permit the seizure and review of those items as well.

18.     *Necessity of seizing or copying entire computers or storage media.*  In most cases,

a thorough search of a premises for information that might be stored on storage media often

requires the seizure of the physical storage media and later off-site review consistent with the

warrant. In lieu of removing storage media from the premises, it is sometimes possible to make

an image copy of storage media.  Generally speaking, imaging is the taking of a complete

electronic picture of the computer's data, including all hidden sectors and deleted files.  Either

seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded

on the storage media, and to prevent the loss of the data either from accidental or intentional

destruction.  This is true because of the following:

19.     *The time required for an examination*. As noted above, not all evidence takes the

form of documents and files that can be easily viewed on site.  Analyzing evidence of how a

computer has been used, what it has been used for, and who has used it requires considerable

time, and taking that much time on premises could be unreasonable. Storage media can store a

large volume of information.  Reviewing that information for things described in the warrant can

take weeks or months, depending on the volume of data stored, and would be impractical and

invasive to attempt on-site.

20.     *Technical requirements*.  Computers can be configured in several different ways,

featuring a variety of different operating systems, application software, and configurations.

Therefore, searching them sometimes requires tools or knowledge that might not be present on

the search site.  The vast array of computer hardware and software available makes it difficult to

know before a search what tools or knowledge will be required to analyze the system and its data

on the Premises.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

21.     *Variety of forms of electronic media*.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

22.     *Nature of examination*.  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying of computers, cellular devices, and/or storage media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the computer or entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## INVESTIGATION

23.     On Wednesday, November 2nd, 2022, Homeland Security Investigations (HSI) Special Agent (SA) Sean Murphy received a phone call from the Phoenix Police Department in Phoenix, AZ. During the call, Phoenix PD Sergeant Darren Arnson advised a female subject (hereinafter referred to as Witness 1 "WI") was being unlawfully restrained by a human smuggler in Albuquerque, NM. W1 further advised that her sister's two minor children (hereinafter referred to as Minor Victim 1 "MV1" and Minor Victim 2 "MV2") were also being unlawfully restrained by the same smuggler (hereinafter referred to as "suspect") at the same location. MV1 was identified as a 9-year-old female, and MV2 was identified as a 5-year-old female. W1 advised the suspect told her she needed to bring $6,000 to Albuquerque, NM in order to secure the release of her family members. W1 further advised she had already paid more than $30,000 in order to have her sister and nieces smuggled into the United States.

24.     On November 3rd, 2022, SAs from HSI along with Detectives from the Albuquerque Police Department (APD) VICE Unit (collectively referred to as "agents") made direct contact with W1 who confirmed the information previously relayed to HSI by the Phoenix PD. W1 provided agents with a video depicting V1, MV1, and MV2 stating their names to the party recording the video. W1 advised the suspect sent the video to her as proof of life and to prove he had possession of her family members. W1 provided agents with a recording of her call with the suspect(s) to corroborate her version of events. On that recording, agents could hear a female subject was speaking with W1. After some conversation, the female subject passed the phone to an unknown male W1 advised the female subject with whom she was speaking with on the recorded call was her sister. Spanish speaking agents were able to deduce the information on the recording further corroborated the statement from W1 about V1, MV1, and MV2 being

11

unlawfully restrained by the suspect. W1 advised agents that V1's phone was taken from her and turned off.

25.     W1 advised that she had previously paid for V1, MV1, and MV2 to be smuggled into the United States. W1 stated she learned of the additional payment demand from the suspect when the suspect called her directly on November 2nd, 2022. W1 advised the suspect phone number was 505-435-8225. Agents learned the phone carrier was identified as AT&T. Based on the circumstances surrounding their investigation, agents petitioned for an emergency request for cell phone location data from AT&T. The subsequent location data received from AT&T consistently correlated to an area of the 300 Block of Valencia St. SE.

26.     Detectives with APD canvassed the area of Valencia St, however; the area consists of dozens of individual residences. While the general area of the ping location data was consistent with being in the area of Albuquerque, the accuracy of each ping would vary between 300 to 1000 meters. This range of accuracy greatly diminished APD's ability to canvass the location and reduced the chances of actively locating V1, MV1, and MV2 to nearly zero. After determining that relying solely on ping location data was insufficient, agents obtained subscriber information for the suspect's phone number (hereinafter referred as Suspect Phone 1). Agents identified the subscriber as Eloisa VASQUEZ.

27.     Further investigation of Eloisa VASQUEZ revealed another phone number (hereinafter referred to as Suspect Phone 2) for her with an address of 541 Palomas Drive Apt. A (hereinafter referred to as "SUSPECT PREMISES"), and a listed subscriber as AT&T. Agents learned Suspect Phone 2 was directly linked to a money wire-transfer to Mexico in October 2022 by an Eloisa VASQUEZ. During that transaction, VASQUEZ listed the SUSPECT PREMISES as her physical address. Based on this information and their investigation, agents petitioned for

an emergency request from AT&T for cell phone location data from Suspect Phone 2. Agents immediately began receiving location data that correlated to the area of 541 Palomas Drive with an accuracy radius between approximately 8 to 30 meters. As a result of this information, agents began conducting surveillance at the SUSPECT PREMISES.

28.    During their surveillance, agents observed a gray passenger van parked in front of the SUSPECT PREMISES. Agents noted the van had a temporary license plate out of TN. Agents conducted checks of that license plate and discovered it did not return to the State of Tennessee and therefore, was likely a false plate. Agents recognized this as a common indicator of tradecraft used by human smugglers in an attempt to evade and/or thwart law enforcement detection.

29.    As agents continued surveillance, they would periodically leave the location of Palomas Drive to canvass the area of the ping location data provided by AT&T for Suspect Phone 1. During this time, V1 was continually trying to reach the male suspect on Suspect Phone 1. W1 continued to provide agents with additional recordings of her conversations with the male suspect. Agents noted the male suspect was becoming increasingly volatile as conversations with W1 progressed. Based on the erratic behavior of the male suspect, the video of the victims sent to V1 by the suspect male, and their training and experience investigating human smuggling operations, Agents were specifically concerned with the safety of MV1, and MV2. Agents believed it was likely the male suspect and the victims were at the same location, and they noted they were losing the advance of daylight as the evening progressed. V1 advised agents she was so concerned for the safety of her family members she was traveling to Albuquerque,

30.    After exhausting mobile surveillance in conjunction with the ping location data, Detectives with APD obtained a search warrant to use a cell phone interception device

commonly known as a "triggerfish", a device that has the ability to capture and trace the real-time location of a cellular device. Detectives made numerous attempts to locate Suspect Phone 1 with the "triggerfish", but they were unsuccessful. Around that same time, the male suspect had turned off his phone and stopped answer calls from W1 for over an hour.

31.     Once agents determined they could not accurately locate Suspect Phone 1, they refocused their efforts on Suspect Phone 2, which was still pinging at the SUSPECT PREMISES with an accuracy of 8 meters. As Detectives with APD returned to the area of Palomas Drive, they noticed the gray van with a false TN temp tag was arriving back at the SUSPECT PREMISES. As APD Detectives tried to reposition their vehicle, they noticed a large group of people and two small children were exiting the van and entering the SUSPECT PREMISES. Detectives noticed the people exiting the van were of dark complexion and appeared to be of Hispanic descent. Detectives could not tell if the small children the observed entering the SUSPECT PREMISES were MV1, and MV2, however; they saw several large trash bags containing what appeared to be clothes and personal belongings being moved into the SUSPECT PREMISES. Agents immediately recognized this behavior as being consistent with human smuggling.

32.     Detectives continued to surveil the SUSPECT PREMISES while other agents met with W1. W1 arrived at the HSI Albuquerque Office in the evening of November 3rd, 2022. W1 was able to get back in contact with the male suspect (while in the presence of agents) who sounded intoxicated and became more combative with W1. The male continued to demand additional money from W1 and stated he would not release V1, MV1, and MV2 without payment.

33.     Based on the dynamics of the situation, and the result of their investigative efforts thus far, Agents determined the best course of action was to utilize an undercover agent (UCA) to pose as a family friend of W1 to lure the male suspect to agents' location. The UCA would stipulate to the male suspect that he needed to bring V1, MV1, and MV2 to the meet location in order to receive the $6000 payment. The UCA subsequently contacted the male suspect and the male suspect agreed to meet the UCA (Agent Note: The entirety of the conversations between V1 to the male suspect, and the UCA to the male suspect, were in the Spanish language).

34.     Later that same evening, the UCA arrived at the predetermined meet location in Albuquerque and contacted the male suspect. A female suspect answered the phone and told the UCA she could not bring V1, MV1, and MV2 because she has to answer to "the boss" and he was currently asleep. At that same time, Detectives conducting surveillance at the SUSPECT PREMISES noted a male subject had entered the gray van and appeared to be sleeping inside of the van. Detectives also observed a Hispanic female who was actively entering and exiting the SUSPECT PREMISES. Agents determined the female was unlikely to be a smuggled alien or V1 based on how she was allowed to freely move in and out of the SUSPECT PREMISES and given free access to the gray van.

35.     Upon ending the conversation with the female suspect, the UCA made several additional attempts to contact the male suspect using the number for Suspect Phone 1. After approximately 2 hours, the male suspect contacted the UCA and agreed to meet him at an undisclosed location on the outskirts of Albuquerque and stated he would bring V1, MV1, and MV2. Upon confirming the meet location with the UCA, Detectives at the SUSPECT PREMISES saw V1, MV1, and MV2 exit the SUSPECT PREMISES in addition to several other people. Detectives observed V1, MV1, and MV2 enter the gray van with at least three other

people, and several other people entered a Honda Pilot parked next to the van at the SUSPECT PREMISES.

36.     APD Detectives conducted mobile surveillance of the gray van and followed it from the SUSPECT PREMISES directly to the undisclosed meet location. Upon arriving at the location, a male later identified as "Roberto MARTINEZ-GABRIEL" exited the driver's seat of the van and approached the UCA who was standing outside of this vehicle. The UCA asked to see V1, MV1, and MV2 before exchanging money with "MARTINEZ-GABRIEL". Upon confirming that V1, MV1, and MV2 were in the van, the UCA provided "MARTINEZ-GABRIEL" with the money and V1, MV1, and MV2 exited the van and entered the UCA vehicle.

37.     Once the victims were safely secured with the UCA, the takedown signal was given by the UCA, and the van was pinned in its parking spot by members of the HSI Special Response Team (SRT). "MARTINEZ-GABRIEL" was taken into custody after he was given several commands by the SRT to exit the vehicle. Upon searching the immediate area of the front driver's seat, agents located a loaded handgun on the front driver's side floorboard, well within reach of "MARTINEZ-GABRIEL". Additionally, agents located, identified, and arrested Eloisa VASQUEZ as she exited the front passenger side (Agent Note: VASQUEZ had a loaded pistol magazine in her purse that matched the magazine found in the handgun on the floorboard). As agents searched the back seat of the van, they identified two undocumented non-citizens who exited the vehicle without incident. Simultaneously, the Honda Pilot was stopped by APD on Eastbound I-40, agents located approximately 8 additional undocumented non-citizens inside.

38.     Following the arrest of "MARTINEZ-GABRIEL", V1, MV1, and MV2 were brought back to the HSI Albuquerque Office. During this time, additional agents were sent back to the SUSPECT PREMISES to continue surveillance.

39.     Agents debriefed V1 who stated she was held at the location at gunpoint along with her kids by "MARTINEZ-GABRIEL" and Eloisa VASQUEZ for the last four days. V1 stated there were as many as 100 undocumented non-citizens packed into the SUSPECT PREMISES at one time during the last four days and they were not well fed or cared for. V1 stated they were provided the absolute bare minimum of food twice a day and they would be forced to work if they wanted more to eat. V1 stated she washed dishes whenever she could so she could provide MV1 and MV2 with additional food. V1 stated her kids were very afraid and her youngest daughter was traumatized from watching "MARTINEZ-GABRIEL" wave a gun at all of them while yelling "I'm the boss here, you don't make any decisions!" V1 stated no one was allowed to leave and they could not freely move around the house, partly because it was so crowded.

40.     During the debrief, agents asked V1 if there were additional people inside of the SUSPECT PREMISES. V1 said "Yes of course! There's a lot of them!" Agents asked V1 to define "a lot" and she stated there were at least 50 additional people inside of the location including an infant. V1 said she was worried about their health and said members of the organization who would watch over them (who she assumed were armed) were constantly yelling at them to "shut the baby up" (translated from the Spanish language) and they instructed them to cover the infant's mouth whenever it cried. Agents asked V1 if she believed the infant was in imminent danger and she affirmed the infant was in danger. V1 stated she last saw the infant inside the SUBJECT PREMISES just before she left the location.

17

41.     Based on this information, agents believed the remaining occupants inside of the SUSPECT PREMISES were being unlawfully restrained, and they were in imminent danger of death or great bodily injury. Agents were also fearful one of the undocumented non-citizens they encountered in the gray van or Honda Pilot may have been able to get a message back to the SUSPECT RESIDENCE during the initial commotion surrounding their encounter. Agents believed this was a strong possibility because they found a couple cell phones in the gray van that were still on and activated. Believing the criminal organization responsible for overseeing the SUSPECT PREMISES may harm or move the rest of occupants inside, including the infant, if alerted, agents had a clear exigent circumstance to immediately enter the SUSPECT PREMISES and secure the occupants inside for the safety of the occupants.

42.     Utilizing the SRT, agents forced entry into the SUSPECT PREMISES and located approximately 50 undocumented non-citizens including a small toddler who appeared to be approximately 16 months old. The occupants were confined to two small rooms in the SUSPECT PREMISES, along with the infant and the infant's mother. The SUBJECT PREMISES was not searched, only the occupants were removed for their safety. All parties were transported from the scene to the HSI Albuquerque Office and provided with food, water, and routine medical care if needed. "MARTINEZ-GABRIEL" was later identified as Marcelo ALONSO-ALMARAZ based on a database check of his fingerprints.

18

## **CONCLUSION**

Based on the information and facts set forth in this affidavit, I believe the occupants of the TARGET PREMISES are in violation of Title 8 United States Code, Section 1324, Title 18 United States Code, Section 1203, and Title 18 United States Code, Section 922(g)(5)(A), and are using or have used the TARGET PREMISES in furtherance of these crimes.

Agents have observed and corroborated specific articulable facts consistent with human smuggling, persons in possession of firearms during the commission of human smuggling, activity, statements, and facts consistent with hostage taking, and corroborated information provided to them by W1, V1, as well as observations by APD Detectives, agents conducting physical surveillance, and information through cell phone subscriber data and ping locations.

Considering the facts set forth in this affidavit, there is probable cause to believe violation of Title 8 United States Code, Section 1324, Title 18 United States Code, Section 1203, and Title 18 United States Code, Section 922(g)(5)(A), have been committed, are being committed, and will continue to be committed by the occupants of the TARGET PREMISES. Furthermore, I submit there is probable cause to believe the occupants will continue utilizing the TARGET PREMISES in furtherance of human smuggling, and firearms related offenses.

Thus, I respectfully request that a warrant be issued authorizing Homeland Security Investigations, with appropriate assistance from other law enforcement officers, to enter the said premises, to include its surrounding storage sheds, vehicles, storage structures, and outbuildings on the property described in ATTACHMENT A, to search for, seize, and examine the items and/or assets set forth above and in ATTACHMENT B.

(Continued on following page)

AUSA Letitia Simms reviewed and approved this affidavit.

Respectfully submitted,

MICHAEL J MCCLUSKEY
Digitally signed by
MICHAEL J MCCLUSKEY
Date: 2022.11.04
08:21:32 -06'00'

Michael McCluskey
Special Agent, HSI

Electronically submitted and telephonically sworn on November 4th, 2022:

HONORABLE JERRY RITTER
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A**

The TARGET PREMISES is located at 541 Palomas Drive SE Apartment A, Albuquerque, NM. The premises consists of split room tan brick apartment with a brown shingle roof near the corner of Palomas Drive and Bell Avenue. The residence has a side entrance with a metal security door and sliding glass door on the opposite side. The residence is the side closest to Palomas Drive





## ATTACHMENT B

## ITEMS TO BE SEARCHED AND/OR SEIZED

1. Illegally smuggled or undocumented persons.

2. Large amounts of currency, financial instruments, precious metals, jewelry and other items of value and/or proceeds of human smuggling transactions.

3. Any and all customer lists, lists of human smuggling payees, lists of persons to be smuggled or lists of persons who have been smuggled illegally into the United States, travel records, smuggler records, or any notes containing the individual names of such persons, telephone numbers, addresses of these customers or other persons to be illegally smuggled, and any corresponding records of accounts receivable, money paid or received, or cash received to pay for human smuggling or intended to pay for human smuggling efforts.

4. Telephone and address books or notes containing telephone numbers and addresses of co-conspirators.

5. Telephone toll records for homes and/or businesses owned or controlled by suspected co-conspirators, or other communication devices used by them and/or their human smuggling associates.

6. Messages, notes, correspondence, and/or communications between human smugglers and their co-conspirators.

7. Any and all financial or other instruments evidencing placement of assets in the names other than the names of the human smugglers themselves.

8. Books, records, receipts, diaries, notes, ledgers, airline tickets, cashier's checks, money orders and other papers relating to the transportation of suspected undocumented non-citizens.

9.   Firearms and ammunition, including handguns, rifles, shotguns and automatic weapons.

10.  Any and all computers, cellular devices, digital media, and storage media that reasonably appear to contain some or all of the records, information, and/or evidence described in Attachment B. As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data).